# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CAROL THOMPSON,                  :
        Plaintiff            :     CIVIL ACTION NO. 3:13-CV-1311
                     :
      v.                   :     (Judge Nealon)
                     :
CAROLYN W. COLVIN,[1] Acting     :
Commissioner of Social Security  :
        Defendant            :

## MEMORANDUM

On May 13, 2013, Plaintiff, Carol Thompson, filed this instant appeal[2] under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the Social Security Administration ("SSA") denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 1461, et seq. (Doc. 1). The parties have fully briefed the appeal. For the reasons set forth below, the decision of the Commissioner denying Plaintiff's application for DIB will be affirmed.

---

1. Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration ("SSA") on February 14, 2013, and is substituted for Michael J. Astrue as the Defendant in this case pursuant to Federal Rule of Civil Procedure 25(d).

2. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits "is adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

## BACKGROUND

On May 26, 2010, Plaintiff protectively filed[3] an application for DIB

alleging disability beginning on January 23, 2008.  (Tr. 118-122).[4]  The claim was

initially denied by the Bureau of Disability Determination ("BDD")[5] on October

26, 2010.  (Tr. 93).  On December 16, 2010, Plaintiff filed a written request for a

hearing before an administrative law judge.  (Tr. 99-103).  A hearing was held on

December 15, 2011, before administrative law judge Therese A. Hardiman

("ALJ"), at which Plaintiff and an impartial vocational expert, Sean Hanahue

("VE"), testified.  (Tr. 41-66).  On February 23, 2012, the ALJ issued a decision

denying Plaintiff's claims because, as will be explained in more detail infra,

Plaintiff has not been under a disability within the meaning of the SSA from

January 23, 2008, through the date of the ALJ's decision.  (Tr. 28-36).

On April 13, 2012, Plaintiff submitted a request to the Appeals Council to

---

3.  Protective filing is a term for the first time an individual contacts the Social
Security Administration to file a claim for benefits.  A protective filing date allows
an individual to have an earlier application date than the date the application is
actually signed.

4.  References to "(Tr. _)" are to pages of the administrative record filed by
Defendant as part of the Answer on July 10, 2013.  (Doc. 6).

5.  The Bureau of Disability Determination is an agency of the state which initially
evaluates applications for disability insurance benefits on behalf of the Social
Security Administration.

review the hearing decision.  (Tr. 20).  On March 26, 2013, the Appeals Council

denied the request for review of the ALJ's decision.  (Tr. 1).  Thus, the ALJ's

decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on May 13, 2013.  (Doc. 1).  On July 10,

2013, Defendant filed an answer and transcript from the SSA proceedings.  (Docs.

5, 6).  Plaintiff filed a brief in support of her complaint on August 14, 2013.  (Doc.

7).  On December 2, 2013, Defendant filed a brief in opposition.  (Doc. 14).  On

December 16, 2013, Plaintiff filed a reply brief.  (Doc. 15).  On January 15, 2015,

the case was reassigned to the Undersigned via verbal order, and the matter is now

ripe for review.

Plaintiff was born in the United States on November 13, 1966, and at all

times relevant to this matter was considered a "younger person."[6]  Plaintiff

obtained her high school diploma, and can communicate English.  (Tr. 44, 45,

393).  Her employment records indicate that she previously worked as a program

coordinator.  (Tr. 138).  The records of the SSA reveal that Plaintiff had earnings

in the years from 1986 to 2009.  (Tr. 127).  Her annual earnings range from a low

---

6. "Younger person.  If you are a younger person (under age 50), we generally do
not consider that your age will seriously affect your ability to adjust to other work.
However, in some circumstances, we consider that persons age 45-49 are more
limited in their ability to adjust to other work than persons who have not attainted
age 45."  20 C.F.R. § 404.1563(c).

of five thousand seven hundred seventy dollars and sixty-five cents ($5,770.65) in 1990, to a high of sixty-six thousand eight hundred thirty-five dollars and sixty-five cents ($66,835.65) in 2009. (Tr. 127).  Her total earnings during those twenty-four (24) years were seven hundred fifty-one thousand five hundred eighty-one dollars and sixteen cents ($751,581.16). (Tr. 127).  The impetus for her claimed disability was "[s]ensory seizures as a result of [a] tumor removed from brain" and "[e]pilepsy." (Tr. 146).

In a document entitled "Functional Report-Adult" filed with the SSA, Plaintiff indicated that she lived in a house with family. (Tr. 154).  She noted that she prepared meals, cleaned, and took care of her minor daughters with assistance. (Tr. 154-155).  Plaintiff indicated that she could pay bills, count change, handle a savings account, and use a checkbook. (Tr. 157).  Plaintiff shopped for about an hour and a half twice a month for food, clothing for her children, and vitamins. (Tr. 157).  Plaintiff had a valid driver's license, but was "very limited" in her ability to drive. (Tr. 56-57).  Prior to the onset of her condition, Plaintiff was able to drive, stand up, clean, and cook "for a long time." (Tr. 155).

Prior to the onset of her condition, Plaintiff would attend parties and go dancing. (Tr. 159).  After she began to experience symptoms from her condition, Plaintiff "very rarely" spent time with others. (Tr. 158).  Plaintiff attended church

once a month, and needed someone to accompany her.  (Tr. 158).

At her hearing before the ALJ, Plaintiff testified that while her onset date was January 2008, she continued to work until July 2009.  (Tr. 45).  She testified that she had not worked since July 2009, and received unemployment compensation, which she was still receiving at the time of her hearing.  (Tr. 46). Plaintiff testified that she took care of her personal needs, including bathing, grooming and dressing, but, if she had a seizure, she may have needed some assistance.  (Tr. 48).  She needed assistance with shopping, cleaning, cooking, and taking care of her young child.  (Tr. 48-49).  In the thirty (30) days leading up to her hearing, Plaintiff testified that the most she lifted was twenty (20) pounds. (Tr. 50).

Plaintiff testified that her sleep was interrupted by seizures.  (Tr. 51). Plaintiff would feel a vibration in her body, specifically along her right side, which would get numb and heavy.  (Tr. 51).

Plaintiff testified that she could stand for forty-five (45) minutes and sit for two (2) hours.  (Tr. 52).  She testified to having a valid driver's license, and that she drove when necessary.  (Tr. 56-57).

At the time of her hearing, Plaintiff testified that she was taking Lyrica and Tegretol.  (Tr. 52).  Plaintiff stated that her medication was effective in

comparison to the other medications she was prescribed, but caused her to experience drowsiness. (Tr. 53). According to Plaintiff, Lyrica alleviated the pain in her right foot, but she still experienced numbness. (Tr. 53). Plaintiff indicated that Tegretol offset her seizure symptoms by "70 percent." (Tr. 53).

Plaintiff stated that while having a seizure, she did not collapse to the floor, did she have muscle spasms, or lose consciousness. (Tr. 55, 61-62). Plaintiff described her seizure symptoms as a vibration that started in her right foot and moved up the right side of her body lasting up to five (5) minutes. (Tr. 55-56). At times, she experienced these symptoms on her left side. (Tr. 55). These events made her foot feel very heavy and sore. (Tr. 55). When she experienced right-leg heaviness, she was forced to drag her leg when she walked. (Tr. 60). These vibrations were noticeable and occurred more than once a day. (Tr. 56). In addition to her seizures, Plaintiff also testified to feeling confused at times, which began after her surgery in January 2008. (Tr. 57-58).

## MEDICAL RECORDS

A few days after giving birth on January 2, 2008, Plaintiff developed a sudden electric shock sensation in her right foot and toes. (Tr. 367). Numbness and tingling then spread up the right side of her body. (Tr. 367). The right side of her body began to shake, which lasted a couple of minutes. (Tr. 367).

6

On January 12, 2008, Plaintiff presented to the Pocono Medical Center's ("PMC") emergency room with complaints of shaking in her right upper and lower extremities for approximately ten (10) minutes. (Tr. 288). Plaintiff stated that she "had some headache[s]," but had not experienced blackouts or dizziness. (Tr. 281). Further, Plaintiff reported that she had not experienced any pulmonary numbness or weakness in her limbs. (Tr. 281). Plaintiff stated that her memory had been good. (Tr. 281). Plaintiff then had CT and MRI scans taken of her head, which showed that Plaintiff had a meningioma. (Tr. 281-283, 285). Plaintiff was admitted to PMC for further evaluation. (Tr. 281). At the end of January 14, 2008, and into the early hours of January 15, 2008, Plaintiff had a minor right-sided seizure. (Tr. 283). Plaintiff did not have any more seizures at PMC, but complained of imbalance. (Tr. 283).

On January 18, 2008, Plaintiff was admitted as a patient to New York-Presbyterian Hospital's ("NYPH") Department of Neurological Surgery. (Tr. 177). After Plaintiff's admission, she underwent a CT scan of her brain. (Tr. 198). The scan found a three (3) centimeter mass at the left posterior frontal-parietal convexity, which was increased in attenuation. (Tr. 198). Further, associated coarse calcifications were found at the superolateral margin. (Tr. 198). The radiology report noted that a minor edema was present in the adjacent

posterior frontal lobe.  (Tr. 198).  The report concluded that the mass at the left

posterior frontal parietal convexity "[was] likely an extra-axial meningioma."  (Tr.

198).  The report also stated that an MRI with gadolinium was necessary for

further evaluation.  (Tr. 198).

On January 20, 2008, Plaintiff received an MRI, which showed a left

parietal extra-axial mass, with associated dural tail, a finding compatible with

meningioma.  (Tr. 200).  On January 21, 2008, Plaintiff underwent a left frontal

craniotomy with resection of meningioma.  (Tr. 177-181, 183 196-197, 200-201).

On January 22, 2008, Plaintiff received a post operative MRI.  (Tr. 203).   No

evidence of a residual tumor was found.  (Tr. 203-204).

On January 23, 2008, the attending neurosurgery physician reported that

Plaintiff was doing well and that her staples would be removed on the following

Wednesday.  (Tr. 184).  Plaintiff was discharged from NYPH on January 23, 2008.

(Tr. 233).  As part of her discharge summary, Plaintiff was instructed to, inter alia,

resume her dosages of Dilantin, Keppra, and Lorazepam.  (Tr. 234, 236).  Further,

Plaintiff was also instructed that she could perform normal physical activity "as

tolerated."  (Tr. 234, 235).

On February 2, 2008, Plaintiff went to PMC's emergency room for the

removal of her surgical staples.  (Tr. 295-296).  In addition to indicating that she

was not having problems, PMC's emergency record noted that her motor and sensory examinations were normal.  (Tr. 296, 298).

On February 11, 2008, Plaintiff was admitted to PMC for chest pain.  (Tr. 306).  Incidentally, Plaintiff stated that she had no headaches, weakness, numbness, or tingling.  (Tr. 302).  Further, no focal motor defects were reported.  (Tr. 302).  It was noted that Plaintiff "[hadn't] had any motor or sensory partial seizures since surgery."  (Tr. 306).  Plaintiff's muscle exam resulted in a score of 5/5.  (Tr. 302).  Plaintiff also underwent a neurological examination during her admission to PMC.  (Tr. 302).  Other than a "depression over the left side of the head," Plaintiff's neurological exam was normal.  (Tr. 306).  Plaintiff's mentation was clear and her upper extremities did not present abnormalities.  (Tr. 306-307).  Plaintiff's right lower extremity presented with no weakness, and with  normal tone, vibration, and joint sense.  (Tr. 307).  It was noted that Plaintiff's right lower extremity presented with a decreased pin prick and touch sensation.  (Tr. 307).  Plaintiff's left lower extremity presented with no weakness, and with normal tone, and sensation.  (Tr. 307).  Plaintiff's trunk was found without sensory defects, which she had previously experienced.  (Tr. 307).  It was also noted that Plaintiff "also had sensory deficit in right upper extremity and right face which [did not] exist anymore."  (Tr. 307).  Plaintiff was diagnosed with "[s]tatus post

9

meningioma over the left frontal parietal area which [had] been removed. Status post right-sided motor and sensory partial seizures. Persistent sensory symptoms and subjective weakness," in her right lower extremity. (Tr. 307). Plaintiff was ordered to perform physical therapy and continue Dilantin, Keppra, and Lorazepam. (Tr. 307). Plaintiff was discharged from PMC on February 13, 2008. (Tr. 299).

On March 16, 2008, Plaintiff felt heaviness in her right foot, which then moved up to her right shoulder and the right side of her face. (Tr. 314). This heaviness lasted about three (3) to four (4) minutes. (Tr. 314). Plaintiff then felt a hot and cold sensation all over her right foot. (Tr. 314). Plaintiff went to the emergency room at Montefiore. (Tr. 314). A CAT scan was performed on Plaintiff's brain, which showed "underlying encophalomalacia on the left parietal area." (Tr. 314). Plaintiff's discharge instructions stated that her "exam showed that [she] had a seizure." (Tr. 436). Upon discharge, she was instructed to "not ride a bike, drive a car, go swimming, climb in high or dangerous places such as ladders or roofs, or operate any dangerous equipment until [she had her] doctor's permission." (Tr. 436).

On March 18, 2008, Plaintiff was seen by Dr. Stuber at NYPH "after she had several attacks of right-sided sensory seizures on [March 17, 2008], and

10

similar attacks of right-sided focal seizures characterized by numbness and tingling in the right foot reaching to the face and left shoulder on [March 18, 2008]." (Tr. 314).  Dr. Stuber prescribed a five hundred milligram (500 mg) daily dose of Depakote.  (Tr. 314).  Plaintiff's symptoms continued, and her dose of Depakote was increased, but the increase in dose did not control her seizures.  (Tr. 314).  Subsequently, Plaintiff slept well for two (2) days, but when she woke up on the third day, "[her] right foot felt heavy and she walked sideways."  (Tr. 314).  Plaintiff also reported that she felt dizzy while walking, and there was transient numbness in her right foot.  (Tr. 314).

On March 27, 2008, Plaintiff presented to PMC and underwent a neurological evaluation.  (Tr. 319).  Plaintiff's mentation was found to be clear, and her speech and hearing were normal.  (Tr. 319).  Plaintiff conveyed that she did not have weakness in her right upper extremity, which was found to have normal tone and sensation.  (Tr. 319).  Plaintiff's left upper extremity did not have motor, cerebellar, extrapyramidal, or sensory abnormalities.  (Tr. 319).  The tone and sensation in her lower right extremity were normal, and without weakness.  (Tr. 319).  Further, no motor or sensory abnormalities were found in Plaintiff's lower left extremity.  (Tr. 319).  Plaintiff was diagnosed with recurrent right-sided focal seizures, status post left-sided parietal meningioma removed, mild

encephalomalacia postoperatively over left parietal area, dizziness, and chest pains. (Tr. 312). Plaintiff's treatment plan was set by Dr. Giriwarlal Gupta to manage her "uncontrollable seizures and side effects of the medication." (Tr. 319).

On March 30, 2008, Plaintiff was discharged from PMC. (Tr. 312). Plaintiff was instructed to wean off Dilantin, and to begin taking Keppra at two thousand milligrams (2,000 mg) twice daily and two (2) five hundred milligram (500 mg) tablets of Depakoe twice daily. (Tr. 312).

On November 29, 2008, Plaintiff presented to PMC's emergency room with complaints of dizziness and lightheadedness that spanned four (4) days, which eventually resolved. (Tr. 321). Plaintiff also conveyed that she experienced numbness and tingling in her right foot at the "start" of the day, which also resolved. (Tr. 321). Plaintiff was found to be alert and cooperative. (Tr. 321). Plaintiff reported that the severity of her symptoms reached moderate levels. (Tr. 322). A neurological evaluation was performed and found, inter alia, Plaintiff's motor strength to all extremities to be strong and equal. (Tr. 322). Plaintiff was discharged and instructed to not drive "today," to continue her medicines, and not to work until Monday. (Tr. 324, 326).

On March 30, 2009, Plaintiff had an outpatient neurological examination

initial visit with Dr. Labar at the Weill Medical College of Cornell University.
(Tr. 434-435).  Plaintiff's chief complaint was noted as seizures.  (Tr. 434).
Plaintiff conveyed that she was experiencing less seizures, which were more mild,
but persistent.  (Tr. 435).  Plaintiff stated that she drove, and asserted that she
"always kn[ew]" if she was going to experience a seizure because she would feel it
first in her right toe.  (Tr. 434).  Plaintiff reported that leading up to her
appointment, she experienced episodic right leg heaviness several times per week.
(Tr. 435).  Plaintiff also reported that over the three (3) months prior to her visit,
she suffered twenty (20) to thirty-nine (39) seizures.  (Tr. 435).  Plaintiff stated
that she was taking Trileptal, Keppra, and Depakote.  (Tr. 435).  Plaintiff's
seizures persisted while she was taking "[K]eppra 4000," which also caused side
effects.  (Tr. 435).  At the time of her visit, Plaintiff was on the maximum dose of
Trileptal and still experienced seizures.  (Tr. 435).  Plaintiff also experienced
seizures on "VPA" with "level 72."  (Tr. 435).

On April 2, 2009, Plaintiff was admitted to NYPH due to complaints of
seizure symptoms.  (Tr. 245).  On April 6, 2009, Plaintiff was discharged.  (Tr.
248).  Plaintiff was instructed to take a Depakote extended release five hundred
milligram (500 mg) tablet orally once a day for thirty (30) days, two (2) Keppra
seven hundred and fifty milligram (750 mg) oral tablets every twelve (12) hours

13

for thirty (30) days, and an Oxcarbazepine six hundred milligram (600 mg) oral tablet every twelve (12) hours for thirty (30) days. (Tr. 249). Plaintiff was allowed to engage in activity as tolerated. (Tr. 247). Plaintiff was instructed to make a follow-up appointment with Dr. Labar within two (2) weeks. (Tr. 245).

While admitted at NYPH, Plaintiff had a video EEG study performed at NYPH's Comprehensive Epilepsy Center. (Tr. 278). The study began on April 2, 2009, and ended on April 6, 2009. (Tr. 278). On April 9, 2009, a video electroencephalography report was prepared by Dr. Srishi Nangia. (Tr. 278). According to the report, Plaintiff reported multiple episodes of right foot, right leg, and/or right arm numbness during the EEG study. (Tr. 278). However, Dr. Nangia noted that "[t]here was no background change in the EEG during these events." (Tr. 278). Dr. Nangia's impression was that this was an "abnormal video EEG" study "in the awake, drowsy and asleep states." (Tr. 278). Dr. Nangia found that the study showed "mild left parieto-temporal cerebral dysfunction." (Tr. 278). Dr. Nangia also noted that "[t]he patient reported multiple episodes of right foot and right leg numbness. There was no electrographic correlate to these events." (Tr. 278-279). Finally, Dr. Nangia noted that "[t]he breach rhythm on the left parieto-temporal region [was] in keeping with the patient's prior history of left parietal craniotomy." (Tr. 279).

14

On April 15, 2009, Plaintiff presented to NYPH's emergency department with a chief complaint of reaction to seizure medications.  (Tr. 250).  Plaintiff complained that her increased dose of Oxcarbazepine caused her to have a reaction.  (Tr. 250).  Specifically, Plaintiff stated that she was experiencing abdominal cramps and body aches.  (Tr. 250).  A CT scan was performed on Plaintiff's brain, which found "[n]o CT evidence of acute infarction or intracranial hemorrhage."  (Tr. 256).  Plaintiff was discharged on the same day, and her Trileptal dose was changed.  (Tr. 255).  Plaintiff was also instructed, inter alia, to call Dr. Labar to make an appointment within one (1) week.  (Tr. 255).

On May 29, 2009, Plaintiff presented to PMC's emergency department with a chief complaint of a rapid heart beat and shortness of breath.  (Tr. 327, 329).  Specifically, Plaintiff reported that she developed numbness in her legs and an increased heart rate when walking.  (Tr. 327).  According to Plaintiff, these symptoms began when she began taking Trileptal and occurred twice a week.  (Tr. 327).  The maximum severity of these symptoms was moderate, and was exacerbated by Trileptal.  (Tr. 328).  Plaintiff was discharged on the same day. (Tr. 333).

On August 3, 2009, Plaintiff had an appointment with Dr. Anil Mendiratta at the Columbia Comprehensive Epilepsy Center.  (Tr. 367).  During the

appointment, Dr. Mendiratta performed a neurological examination on Plaintiff. (Tr. 369). Dr. Mendiratta found Plaintiff to be awake, alert, attentive, conversant, and oriented. (Tr. 369). Plaintiff's facial sensation and strength was symmetric, her hearing was normal, and her motor strength was found to be of normal bulk and tone, with full strength throughout. (Tr. 369). Dr. Mendiratta noted that Plaintiff had diminished vibration sensation in her right toes, and a slightly diminished temperature below her left knee. (Tr. 369).

Dr. Mendiratta also noted that Plaintiff's "description of paroxysmal, stereotyped right-sided episodes is convincing for epileptic simple partial seizures, and she clearly [needed] to remain on anticonvulsant medication." (Tr. 369). Dr. Mendiratta stated that Plaintiff's "persistent right-sided discomfort, which [had] been present since surgery, [was] not likely epileptic in nature." (Tr. 369). According to Dr. Mendiratta, "[t]hese symptoms [were] more consistent with dysfunction in the sensory cortext, and the brain MRI [did] show encephalomalacia/gliosis in this region." (Tr. 369). Dr. Mendiratta also expressed concern that Plaintiff "[was] experiencing prominent adverse medication effects on Keppra and Trileptal, and that the current once daily dosing regimen [was] not adequate to maintain steady state levels." (Tr. 369). Dr. Mendiratta advised that Plaintiff be scheduled for video-EEG monitoring. (Tr. 369). Dr. Mendiratta also

16

noted that "[a]lthough she [had] not had seizures associated with loss of awareness, she [found] the simple partial seizures to be quite debilitating." (Tr. 370).

From August 17, 2009, to August 21, 2009, Plaintiff was admitted to NYPH for the purpose of undergoing an EEG monitoring video record study. (Tr. 362). The results of the EEG study, inter alia, were transcribed in an Adult Epilepsy Monitoring Unit Report. (Tr. 362-366). The report noted that following Plaintiff's resection of the meningioma, she experienced persistent sensory disturbances. (Tr. 363). Plaintiff "never had loss of awareness during these spells." (Tr. 363). Further, the report stated that "[t]here [was] no history of staring spells or nocturnal tonic-clonic convulsions." (Tr. 363).

The EEG study found a breach rhythm over the left frontal-central area, but failed to detect evidence of "clear seizures." (Tr. 365). "However, she had two of her typical events that awoke her from stage I/II sleep." (Tr. 365). According to Plaintiff, these two (2) events caused a sensation of internal shaking, sometimes on the right side of her body. (Tr. 365). The report noted that while "there were no electrographic correlates with these two events," Plaintiff experienced a mild increase in her heart rate during both time periods. (Tr. 366). The report also stated that Plaintiff's episodes of worsening chronic pain and numbness in her

right foot were not associated with any abnormal electrographic correlates.  (Tr. 366).  The report concluded that "[n]o epileptiform activity was associated with any of her spells."  (Tr. 367).  However, the episodes Plaintiff experienced raised the possibility of left parietal simple partial seizures.  (Tr. 365).  Plaintiff was discharged after the EEG study with instructions to take Lyrica and Keppra, with the plan to ultimately be weaned off Keppra.  (Tr. 365).  Plaintiff was also instructed to discontinue Trileptal.  (Tr. 365).

On October 21, 2009, Plaintiff was seen by Dr. Mendiratta at NYPH.  (Tr. 358).  According to Dr. Mendiratta, since her discharge, "she [] continued on Levetiracetam 375 mg BID, and her Lyrica dosage [was] titrated to a dosage of 100/200 mg BID."  (Tr. 358).  Dr. Mendiratta stated that "[w]ith titration in her Lyrica dosage, she [] noted a marked improvement in the right leg discomfort.... 80 to 90% better."  (Tr. 358).  Dr. Mendiratta and Plaintiff "agreed that she should continue on the present dosage."  (Tr. 360).  Plaintiff convey to Dr. Mendiratta that she continued to notice numbness, particularly in her foot.  (Tr. 358).  "She had also had intermittent 'spasm' sensations in the right left, but not episodes of overt or internal shaking."  (Tr. 358).  It was noted that, during her examination, Plaintiff was awake, alert, attentive, conversant, and oriented.  (Tr. 359).  Plaintiff's motor system was found to be of normal bulk and tone, with full

strength throughout.  (Tr. 359).  Plaintiff showed "[s]lightly slowing RSMs in right foot.  No pronator drift."  (Tr. 359).  She was found to have diminished vibration in her right toes, and slightly diminished temperature below the right knee.  (Tr. 359).

Dr. Menditta also noted in the impressions section of his report that "[t]he stereotyped, paroxysmal right-sided episodes, which consist[ed] of an internal vibration sensation, [were] most likely simple partial seizures."  (Tr. 360).  Having occurred for more than eight (8) months after her surgery, Dr. Menditta concluded that "this [was] consistent with localization related epilepsy, and she [would] likely need to continue on medication long term."  (Tr. 360).  Dr. Menditta also stated that "[f]ortunately, following titration in her [L]yrica dosage, she [had] not had any of these episodes."  (Tr. 360).  Dr. Menditta noted that if Plaintiff "remain[ed] free of episodes, she [would] call in one month, at which time we [would] taper and withdraw Levetiracetam over a 3 week period, with a goal of Lyrica monotherapy."  (Tr.  360).  Further, Dr. Menditta concluded that Plaintiff's persistent right-sided numbness was "not likely epileptic in nature, and [was] rather consistent with dysfunction in the left sensory cortex." (Tr. 360).

On November 12, 2009, Plaintiff was seen by Dr. Steven Karceski at the

Harlem Hospital Center ("HHC"), upon referral from Dr. Mendiratta.  (Tr. 388).

After performing a neurological exam on Plaintiff, Dr. Karceski made the

following findings:  Plaintiff was awake and alert; her speech was clear and fluent;

her motor strength was 5/5; she was of normal tone and bulk; her reflexes in both

arms and her right leg were +2 and were +1 in her left leg; and her sensation was

diminished "LT right leg," which Dr. Karceski opined was more of a dysthesia

that Plaintiff had since her surgery.  (Tr. 391).  Plaintiff's temperature and

vibration sensations in her right leg were found to be normal, even though, as Dr.

Karceski noted, they were diminished in the past.  (Tr. 391).  Dr. Karceski's

primary diagnosis was localization-related, focal and partial, epilepsy and epileptic

syndromes with simple partial seizures, without mention of intractable epilepsy.

(Tr. 391).  According to Dr. Karceski, these symptoms were likely due to a

"combination of sensory simple partial seizures as well as cortical injury from her

meningioma, etc." (Tr. 391).  Dr. Karceski noted that Lyrica helped Plaintiff with

her symptoms, and he agreed with the plan set out by Dr. Mendiratta to increase

Lyrica and discontinue Keppra.  (Tr. 391).  Specifically, Dr. Karceski ordered

Plaintiff to increase her Lyrica dose to two hundred (200) to three hundred (300)

milligrams for two (2) weeks, and to discontinue Keppra.  (Tr. 391).  Further, if

Plaintiff's symptoms persisted, she was instructed to increase her "PGB to 300 mg

po BID."  (Tr. 391).

On November 24, 2009, Plaintiff went to HHC for a follow-up because she could not obtain Lyrica.  (Tr. 385-386).  During this visit, it was noted that Plaintiff continued to experience "seizure feelings."  (Tr. 385).  These feelings occurred three (3) to four (4) times a day and consisted of a combination of the following: numbness, tingling, pain, and, at times, "shaking of the right great toe" that spread to all five (5) toes, "and then up the leg to the right thigh."  (Tr. 385).  Plaintiff reported that rarely experienced "visible movement," rather "it [was] more an episodic sensation of shaking."  (Tr. 385).  Further, Plaintiff had "never experienced an event that caused alteration or loss of consciousness."  (Tr. 385-386).  In attempt to remedy her inability to acquire Lyrica, Plaintiff was given Gebepentin as a substitute.  (Tr. 386).

Plaintiff again presented to HHC on January 14, 2010.  (Tr. 382-384, 406-410).  Plaintiff conveyed to Dr. Karceski that since receiving her prescription for Gebepentin, her "events" were milder and fewer, until "Christmas Day when she had a 'bigger' one consisting of a left head sensation 'tightening' followed by an intense but typical seizure."  (Tr. 382).  While at HHC, Plaintiff underwent a neurological exam.  (Tr. 383).  Plaintiff was found to be awake and alert.  (Tr. 383).  Her speech was clear and fluent.  (Tr. 383).  Plaintiff scored a 5/5 on a

motor exam, with no drift found.  (Tr. 383).  Plaintiff's motor system was also
found to be of normal bulk and tone.  (Tr. 383).  Her reflexes were +2 in both arms
and her right leg, while Plaintiff's reflexes in her left leg were +1.  (Tr. 383).  Her
gait was found to be normal.  (Tr. 383).  Plaintiff's senses in her "LT right leg"
were found to be diminished, which Dr. Karceski found to be more of a dysthesia.
(Tr. 383).  Her sense of temperature and vibration were found to be normal.  (Tr.
383).  Dr. Karceski's primary diagnosis was that Plaintiff had a "[l]ocalization-
related (focal) (partial) epilepsy and epileptic syndromes with simple partial
seizures, without mention of intractable epilepsy."  (Tr. 383).  Dr. Karceski
ordered a titration of Zonisamide, and instructed Plaintiff to wean off of
Gebepentin.  (Tr. 384).

On February 2, 2010, Plaintiff presented to the PMC's emergency
department with the chief complaint of right-side pain and a request of a
medication refill.  (Tr. 346, 351).  According to PMC's emergency record,
Plaintiff was running out of "Zonegram," and she stated that she could not find a
neurologist to treat her because she "[had] no insurance."  (Tr. 347).  Plaintiff
rated her pain as a five (5) out of ten (10).  (Tr. 347).  Plaintiff underwent a
neurological evaluation at PMC, which found her to be alert, cooperative, and
coherent.  (Tr. 347).  Plaintiff did not have a headache, paralysis, or parathesias.

22

(Tr. 349).  Further, Plaintiff's motor, sensory, cranial nerve, and cerebellar exams were normal.  (Tr. 349).  Plaintiff was discharged in stable condition.  (Tr. 349).

On March 10, 2010, Plaintiff contacted HHC by phone.  (Tr. 394).  Plaintiff was instructed to reduce the "ZNS to 200 mg daily, and resume GBP at a dose of 400 mg po TID."  (Tr. 394).  On March 11, 2010, Plaintiff had telephone contact with Dr. Karceski at HHC.  (Tr. 394).  Plaintiff reported that since her "last increase" in dose she "[had] been feeling 'bad.'"  (Tr. 394).  Specifically, Plaintiff stated that she experienced an upset stomach and nausea, and vomited once "[three] weeks ago."  (Tr. 394).  Plaintiff also complained of cognitive problems "probably since the start of ZNS," specifically that she felt confused.  (Tr. 394).  Since her medication change the day before, Plaintiff reported that she already felt better.  (Tr. 394).  Plaintiff also stated that she was "not sure if she [was] having seizures, though there was a single episode of right-sided numbness in February" approximately one (1) week after stopping "GBP."  (Tr. 394).  According to Plaintiff, this was different from her previous events because it was longer than usual.  (Tr. 394).  Plaintiff also reported that her Zonegran was not helping.  (Tr. 394).  Plaintiff was instructed to resume "GBP monotherapy" and wean off "ZNS."  (Tr. 394).  Additionally, Plaintiff was told "[n]o driving, heights, etc." (Tr. 394).

On March 30, 2010, Plaintiff underwent a MRI scan of her brain at HHC. (Tr. 399).  The scan found, <u>inter alia</u>, some FLAIR hyperintensity in her left posterior parietal region near the vertex, which may represent gliosis.  (Tr. 399). No evidence of acute infarction, abnormal enhancement, or recurrent lesion was found.  (Tr. 399, 430-433).

On April 8, 2010, Plaintiff was seen by Dr. Hyunmi Choi at HHC.  (Tr. 380).  Plaintiff reported that since January 2010, her episodes of right leg twitching followed by tingling and numbness, which often lasted hours, occurred more frequently.  (Tr. 380).  "In the meantime, she [had] decreased her [G]abapentin dose to 800 mg BID, because of dizziness and fatigue."  (Tr. 380). Plaintiff underwent a neurologic exam during her visit with Dr. Choi.  (Tr. 380). She was found to be alert and oriented.  (Tr. 380).  Her speech was fluent.  (Tr. 380).   Plaintiff's cranial nerves, motor, tone cerebellar, gait, station, and sensory exams were normal.  (Tr. 380-381).  Plaintiff's reflexes were grade +2.  (Tr. 380-381).  Dr. Choi found that "[i]n the setting of reducing [G]abapentin on her own, [Plaintiff] [had] been having more frequent simple partial motor seizures, followed by sensory changes affecting her right leg."  (Tr. 381).  Plaintiff was instructed to increase her Gabapentin dose to "800 mg TID" and return in three (3) months. (Tr. 381).

On April 20, 2010, Plaintiff presented to PMC's emergency department with a chief complaint of swelling and pain along her right fourth fingernail. (Tr. 352-353). Plaintiff was alert and oriented. (Tr. 353). Her upper extremities had intact sensation with no numbness or tingling and with full range of motion. (Tr. 353). During her visit, Plaintiff underwent motor and sensory exams, both of which were normal. (Tr. 354). In addition, no paralysis or parathesias was found. (Tr. 354). Plaintiff was discharged later that day. (Tr. 354).

On May 5, 2010, Plaintiff had telephone contact with HHC. (Tr. 396). Plaintiff complained of events that caused her heart to race, right foot tightening, and trouble breathing. (Tr. 396). Plaintiff stated that these events lasted a couple minutes each, and she had two (2) events in a span of ten (10) minutes. (Tr. 396). It was noted that she did not lose awareness during these events. (Tr. 396). Plaintiff was taking Gabapentin "800 mg tid and no other medications." (Tr. 396). She was instructed to take "1200 mg of gabapentin tonight and tomorrow morning." (Tr. 396).

On May 6, 2010, Dr. Karceski was provided with a note detailing the contact HHC had with Plaintiff the night before. (Tr. 396). Dr. Karceski then spoke with Plaintiff, who informed him that her episodes were milder since her contact with HHC on May 5, 2010. (Tr. 397). Plaintiff also conveyed that she

experienced an "internal" feeling of shaking in her right leg.  (Tr. 397).  She had

two (2) events altogether, with each lasting two (2) minutes.  (Tr. 397).  Plaintiff

was instructed to continue her increased dose of Gabapentin.  (Tr. 397).   Dr.

Karceski also noted that he spoke to Plaintiff earlier in the week and instructed her

to come to his clinic on Tuesday, but that "she did not come."  (Tr. 396).

On May 11, 2010, Plaintiff was seen by Dr. Karceski at HHC.  (Tr. 375).

Dr. Karceski noted that since Plaintiff's resumption of Gabapentin, her simple

partial seizures did not improve.  (Tr. 375).  According to Plaintiff, the simple

partial seizures occurred "nearly all the time," proceeding through periods of

waxing and waning  (Tr. 375).  Dr. Karceski noted that Plaintiff's increased

dosage of Gabapentin not only failed to improve her "events," but caused her to

experience sleepiness and a feeling of vertigo.  (Tr. 375).  Plaintiff reported that

she "experience[d] a sense of 'panic'" when the medication side-effects were

particularly severe.  (Tr. 375).  Plaintiff also stated during her visit that Lyrica had

been the best medicine for her symptoms.  (Tr. 375).  While on Lyrica, Plaintiff

experienced infrequent "events" and improved mobility of her right leg.  (Tr. 375).

However, due to insurance reasons, Plaintiff was unable to obtain Lyrica.  (Tr.

375).

During her visit to HHC on May 11, 2010, Plaintiff underwent a

neurological examination.  (Tr. 376).  Plaintiff was found to be alert and awake.

(Tr. 376).  Her speech was clear and fluent.  (Tr. 376).  Plaintiff had a symmetric

facial expression and equal shrug.  (Tr. 376).  Plaintiff's motor strength was 5/5,

but Dr. Karceski noted that she "seemed weaker in the right foot to dorsiflextion."

(Tr. 376).  No pronator drift was found, and her gait was normal.  (Tr. 376).

Plaintiff's motor system exhibited normal tone and bulk.  (Tr. 376).  Her reflexes

in both arms were +2.  (Tr. 376).  Plaintiff's reflexes in her right and left leg were

found to be +2 and +1, respectively.  (Tr. 376).  Plaintiff's sensory exam revealed

a diminished sensation in her "LT right leg from about the hip down, unchanged."

(Tr. 376).  Plaintiff was diagnosed with "[l]ocalization-related (focal) (partial)

epilepsy and epileptic syndromes with simple partial seizures, without mention of

intractable epilepsy."  (Tr. 376).  According to Dr. Karceski, "[t]he recent

worsening of seizures [had] caused right foot weakness as well, coinciding with

her own reports."  (Tr. 376-377).  Dr. Karceski concluded that due to Gabapentin's

ineffectiveness, "[it was] [] now time to switch to AEDs."  (Tr. 377).  Dr. Karceski

then prescribed Plaintiff with Tegretol and instructed her to wean off Gabapentin

over the course of five (5) weeks.  (Tr. 377-378).

On June 29, 2010, Dr. Karceski contacted Plaintiff by telephone.  (Tr. 398).

Plaintiff informed Dr. Karceski that she "[had] been having seizures" and that

Tegretol only helped "a little."  (Tr. 398).  Plaintiff reported two (2) "severe" events, "which is the way she describe[d] events where she [felt] that the right side of her body [was] 'vibrating.'"  (Tr. 398).  Dr. Karceski instructed Plaintiff to increase her Tegretol dose to "400-600 for 1 week, then increase 600 BID."  (Tr. 398).

On July 22, 2010, Plaintiff was seen by Dr. Choi in the Seizure Clinic at HHC.  (Tr. 372).  Dr. Choi noted that during her last visit to HHC, Plaintiff was taken off Gabapentin and placed on Carbamazepine.  (Tr. 373).  According to Dr. Choi, the Carbamazepine improved Plaintiff's partial seizures, "but still not to the degree that Lyrica had in the past."  (Tr. 373).  Plaintiff was instructed to take Lyrica, increasing her dose by one hundred milligrams (100 mg) a week with a limit of three hundred milligrams (300 mg), and wean off Carbamazepine by two hundred milligrams (200 mg) a week once her Lyrica dose reached two hundred milligrams (200 mg).  (Tr. 374).

On September 20, 2010, Plaintiff had an appointment with Dr. Fuhai Li at the Neurology and Pain Management Center in Milford, Pennsylvania ("NPMC"). (Tr. 412).  During the appointment, Plaintiff underwent a neurological examination.  (Tr. 412).  She was found to be awake, alert, and "oriented X3." (Tr. 412).  Plaintiff had fluent speech, and normal comprehension, naming,

repetition, and remote memory.  (Tr. 412).  She was found to have normal sensation to light touch, temperature, and pinprick "in V1 to V3 distribution."  (Tr. 412).  Plaintiff had normal strength of mastication muscle.  (Tr. 412).  Plaintiff's forehead wrinkling, and strength of orbicularies oculi and orbicularis oris were normal.  (Tr. 412).  She had symmetrical nasolabial fold and no facial drooping. (Tr. 412).  Plaintiff had normal sternocleidomastoid and trapezius strength. (Tr. 413).  Her motor strength was found to be 5/5 throughout.  (Tr. 413).  Her muscle tone and bulk were normal.  (Tr. 413).  No rigidity, spasticity, fasciculation, tremor, or other involuntary movement was found.  (Tr. 413).  Plaintiff exhibited decreased sensation to pinprick and temperature in the stock distribution, and slight allodynia.  (Tr. 413).  Her reflexes were found to be symmetrical and normal deep tendon reflex grading +2 was found throughout.  (Tr. 413).  Plaintiff's finger to nose and "heel to shine" coordination test was normal.  (Tr. 413).  No dysmetria was found.  (Tr. 413).  Plaintiff's gait and arm swing were normal.  (Tr. 413).  She had intact rapid altering movement bilaterally.  (Tr. 413).  Plaintiff was able to walk on her toes and heels, and perform tandem walking.  (Tr. 413).  The Romberg and retropulsion tests were both negative.  (Tr. 413).  Dr. Li diagnosed Plaintiff with "[l]ocalization-related (focal)(partial) epilepsy and epileptic syndromes with complex partial seizures, without mention of intractable epilepsy."  (Tr. 413).

Plaintiff was instructed to take a fifty milligram (50 mg) tablet of Lyrica orally three (3) times a day, and to gradually wean off Tegretol in "about two weeks." (Tr. 413).  "She was advised to titrate [L]yrica up from 50mg once daily to 50mg tid in about 2."  (Tr. 413).

On October 1, 2010, Plaintiff underwent nerve conduction studies at the NPMC.  (Tr. 414).  Plaintiff's complaint was "burning pain."  (Tr. 414).  The "EMG & NCV" findings state that "[e]valuation of the Left Sup Peroneal Anti Sensory and the Right Sup Peroneal Anti Sensory nerves showed no response (14 cm)."  (Tr. 414).  Further, it was found that "Left Sural Anti Sensory and the Right Sural Anti Sensory nerves showed no response (Calf)."  (Tr. 414).  All remaining nerves (as indicated in the following tables) were within normal limits."  (Tr. 414). All F wave latencies were found to be within normal limits.  (Tr. 414).  The studies led to the conclusion that "[t]here [was] evidence of sensory neuropathy." (Tr. 414).

On October 18, 2010, a Physical Residual Functional Capacity Assessment ("RFC") was completed by Heather L. Masker.  (Tr. 424).  Plaintiff was found to be able to occasionally lift twenty (20) pounds, frequently lift ten (10) pounds, walk and/or stand for a total of about six (6) hours in an eight (8) hour workday, and sit for a total of about six (6) hours in an eight (8) hour workday.  (Tr. 425).

Plaintiff was not limited in her ability to push and/or pull.  (Tr. 425).  She was also found to be able to occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 426).  No manipulative, visual, or communicative limitations were noted.  (Tr. 426-427).  In regards to environmental limitations, it was found that Plaintiff should avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, and poor ventilation.  (Tr. 427).  It was also found that Plaintiff should avoid even moderate exposure to hazards such as machinery and heights.  (Tr. 427).

Ms. Masker also completed an "RFC Continuation."  (Tr. 429).  Ms. Masker noted in the "RFC Continuation" that Plaintiff alleged disability due to sensory seizures as a result of a tumor removed from her brain.  (Tr. 429).  Ms. Masker also noted that Plaintiff reported a daily inability to function, and that her symptoms resulted in limitations in standing, walking, lifting, carrying, sitting, and completing daily activities.  (Tr. 429).  According to Ms. Masker, "[t]he medical evidence establishe[d] medically determinable impairments of S/P left frontal craniotomy, epilepsy, and poly neuropathy."  (Tr. 429).  Ms. Masker also stated in her assessment that Plaintiff underwent a left frontal craniotomy in January 2008, and she was still experiencing seizures.  (Tr. 429).  Ms. Masker noted that Plaintiff's last seizure prior to her assessment was in March 2010.  (Tr. 429).  Ms.

31

Masker also discussed the results of Plaintiff's examination with Dr. Li from a

September 2010 visit. (Tr. 429). Plaintiff's speech was fluent, and her memory,

vision, gait, and station were normal. (Tr. 429). Plaintiff did not exhibit hearing

loss. (Tr. 429). Her motor strength was 5/5. (Tr. 429). Ms. Masker noted that

Plaintiff was found to have decreased sensation to pinprick and temperature in the

stock distribution. (Tr. 429). Dr. Li also noted a "[s]light allodynia." (Tr. 429).

Ms. Masker stated that the rest of Plaintiff's exam with Dr. Li was "within normal

limits." (Tr. 429). Ms. Masker also noted that "EMG and NCV from 10/10 note

evidence of sensory neuropathy." (Tr. 429). Ms. Masker stated that "[i]n

assessing the credibility of the [Plaintiff's] statements regarding symptoms and

their effects on function and the type of treatment she received was considered."

(Tr. 429). Ms. Masker concluded that "[b]ased on the evidence of record, the

[Plaintiff's] statements [were] found to be partially credible." (Tr. 429).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of

all legal issues decided by the Commissioner. See Poulos v. Comm'r of Soc. Sec.,

474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Comm'r of Soc. Sec. Admin., 181

F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir.

1995). However, the court's review of the Commissioner's findings of fact

pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Poulos, 474 F.3d at 91; Schaudeck, 181 F.3d at 431; Krysztoforski, 55 F.3d at 858; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. § 405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described

33

as more than a mere scintilla of evidence but less than a preponderance.  Brown, 845 F.2d at 1213.  In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight."  Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence.  Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-07.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive DIB, the plaintiff must demonstrate he/she is "unable to engage

34

in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than twelve

months." 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905 (defining disability).

Further,

> an individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he would be
> hired if he applied for work. For purposes of the preceding
> sentence (with respect to any individual), "work which exists in
> the national economy" means work which exists in significant
> numbers either in the region where such individual lives or in
> several regions of the country.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner uses a five-step process in evaluating disability and

claims for disability insurance benefits. See 20 C.F.R. § 416.920. This process

requires the Commissioner to consider, in sequence, whether a claimant (1) is

engaging in substantial gainful activity, (2) has an impairment that is severe[7] or a

---

7. An impairment is severe if it significantly limits an individual's physical or
mental ability to do basic work activities. 20 C.F.R. § 416.920. Basic work
activities are the abilities and aptitudes necessary to do most jobs, such as

combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the Residual Functional Capacity ("RFC") to return to his or her past work and (5) if not, whether he or she can adjust to other work in the national economy.  20 C.F.R. § 416.920.  "The claimant bears the ultimate burden of establishing steps one through four."  Poulos, 474 F.3d at 92 (citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004)).  "At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and [RFC]. "  Id.

As part of step four, when a claimant's impairment does not meet or equal a listed impairment, the Commissioner will assess the RFC.  See 20 C.F.R. § 416.920.  RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  A regular and continuing basis contemplates full-time employment and is defined as eight hours

---

"walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;" "seeing, hearing, and speaking;" "[u]nderstanding, carrying out, and remembering simple instructions;" "[u]se of judgment;" "[r]esponding appropriately to supervision, co-workers and usual work situations;" and "[d]ealing with changes in a routine work setting."  20 C.F.R. § 416.921.

a day, five days per week or other similar schedule. The RFC assessment must

include a discussion of the individual's abilities. Social Security Ruling 96-8p, 61

Fed. Reg. 34475; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359

n.1 ("'[RFC]' is defined as that which an individual is still able to do despite the

limitations caused by his or her impairment(s).").

Using the RFC assessment, the Commissioner will determine whether the

claimant can still perform past relevant work, or can make an adjustment to other

work. Id. If so, the claimant is not disabled; and if not, he is disabled. Id. "The

claimant bears the ultimate burden of establishing steps one through four."

Poulos, 474 F.3d at 92 (citing Ramirez, 372 F.3d at 550). "At step five, the burden

of proof shifts to the Social Security Administration to show that the claimant is

capable of performing other jobs existing in significant numbers in the national

economy, considering the claimant's age, education, work experience, and

[RFC]." Id.

## ALJ DECISION

At step one, the ALJ found that Plaintiff engaged in substantial gainful

activity during the following periods: January 2008 through July 2009. (Tr. 30).

The ALJ found that, "[w]hile [Plaintiff's] application alleges an onset date of

January 23, 2008, [Plaintiff] testified that she actually stopped working in July of

2009." (Tr. 30). The ALJ also found that subsequent to July 2009, Plaintiff did not engage in substantial gainful activity for twelve (12) continuous months. (Tr. 31).

At step two, the ALJ found that Plaintiff had the following severe impairments: "history of left frontal meningioma, status post craniotomy and meningioma rescetion/repair of the dura pedicle and perecranial graft, sensory neuropathy, and seizure disorder." (Tr. 31).

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526). (Tr. 31).

At step four, the ALJ determined that Plaintiff had the RFC to perform sedentary, unskilled work as defined in 20 C.F.R. § 404.1567(a) except Plaintiff could lift/carry up to ten (10) pounds both frequently and occasionally. (Tr. 32). The ALJ also found that Plaintiff was limited to standing/walking for no more than two (2) hours during an eight-hour workday, and occasional climbing, balancing, and stooping, but never on ladders. (Tr. 32).

At step five, the ALJ found that, when considering Plaintiff's age, education, work experience, and RFC, she was unable to perform any past relevant

work, but "there [were] jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform."  (Tr. 32, 34).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act, from January 23, 2008, through the date of the ALJ's decision.  (Tr. 35).

## DISCUSSION

On appeal, Plaintiff asserts the following arguments: (1) "the ALJ failed to properly apply and analyze the applicable listings;" (2) the "ALJ failed to properly consider [Plaintiff's] extensive work record in determining credibility;" (3) the "ALJ's lay evaluation is not sufficient evidence of [Plaintiff's] work capacity;" and (4) the ALJ "[f]ailed to provide evidence of [RFC] work available to unskilled sedentary work with limits and compliance with SSR004P."  (Doc. 7, pp. 7-19); (Doc. 15, pp. 1-4).  Defendant disputes these contentions.  (Doc. 14, pp. 21-27).

### 1.   ALJ's Application and Analysis of the Applicable Listings

Plaintiff contends that the ALJ's determination that she did not have an impairment or combination of impairments that medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 was merely conclusory. (Doc. 7, p. 7).  Plaintiff specifically argues that the ALJ's step three analysis contained minimal application of Listings 11.02 and 11.03 to the facts of her case.

(Doc. 7, pp. 8); (Doc. 15, pp. 3-4). According to Plaintiff, the ALJ's step three analysis was insufficient because it is no more than a one (1) paragraph review of a single medical record; and thus, the ALJ did not rely upon substantial medical information of record in reaching her conclusion. (Doc. 7, p. 8). Plaintiff further argues that the ALJ failed to analyze all the evidence in the record and provide an adequate explanation for disregarding other evidence. (Id. at pp. 9-11). As a result, she argues that the ALJ's decision at step three determination should be overturned. (Id.); (Doc. 15, p. 1).

The relevant portions of 20 C.F.R. Part 404, Subpart P, Appendix 1 can be found in Listing 11.00, which contains the Social Security Neurological Lists. Pursuant to Listing 11.00(A), the degree of impairment in epilepsy, regardless of etiology, will be determined:

> according to type, frequency, duration, and sequelae of seizures. At least one detailed description of a typical seizure is required. Such description includes the presence or absence of aura, tongue bites, sphincter control, injuries associated with the attack, and postictal phenomena. The reporting physician should indicate the extent to which description of seizures reflects his own observations and the source of ancillary information. Testimony of persons other than the claimant is essential for description of type and frequency of seizures if professional observation is not available.

20 C.F.R. Part 404, Subpart P, Appendix 1, 11.00(A).

As identified in the ALJ's decision, Listings 11.02 and 11.03 are the relevant portions of Listing 11.00.  20 C.F.R. Part 404, Subpart P, Appendix 1, 11.02, 11.03.  Listing 11.00(A) continues by stating that:

> Under 11.02 and 11.03, the criteria can be applied only if the impairment persists despite the fact that the individual is following prescribed antiepileptic treatment.  Adherence to prescribed antiepileptic therapy can ordinarily be determined from objective clinical findings in the report of the physician currently providing treatment for epilepsy.  Determination of blood levels of phenytoin sodium or other antiepileptic drugs may serve to indicate whether the prescribed medication is being taken.  When seizures are occurring at the frequency stated in 11.02 and 11.03, evaluation of the severity of the impairment must include consideration of the serum drug levels.  Should serum drug levels appear therapeutically inadequate, consideration should be given as to whether this is caused by individual idiosyncrasy in absorption of metabolism of the drug.  Blood drug levels should be evaluated in conjunction with all the other evidence to determine the extent of compliance.  When the reported blood drug levels are low, therefore, the information obtained form the treating source should include the physician's statement as to why the levels are low and the results of any relevant diagnostic studies concerning the blood levels.  Where adequate seizure control is obtained only with unusually large doses, the possibility of impairment resulting from the side effects of this medication must be also assessed.  Where documentation shows that use of alcohol or drugs affects adherence to prescribed therapy or may play a part in the precipitation of seizures, this must also be considered in the overall assessment of impairment level.

Id. at 11.00(A).

Listing 11.02 identifies convulsive epilepsy as a category of impairment.  20

41

C.F.R. Part 404, Subpart P, Appendix 1, 11.02.  Specifically, Listing 11.02

requires that the following be established:

> convulsive epilepsy, (grand mal or psychomotor), documented
> by detailed description of a typical seizure pattern, including all
> associated phenomena; occurring more frequently than once a
> month, in spite of at least 3 months of prescribed treatment.
> With: A. Daytime episodes (loss of consciousness and
> convulsive seizures) or B. Nocturnal episodes manifesting
> residuals which interfere significantly with activity during the
> day.

Id.  Listing 11.03 identifies non-convulsive epilepsy as a category of impairment

and requires that the following be established:

> nonconvulsive epilepsy, (petit mal, psychomotor, or focal)
> documented by detailed description of a typical seizure pattern
> including all associated phenomena, occurring more frequently
> than once weekly in spite of at least 3 months of prescribed
> treatment. With alteration of awareness or loss of
> consciousness and transient postictal manifestations of
> unconventional behavior or significant interference with
> activity during the day.

Id. at 11.03.

According to Plaintiff, the ALJ failed to make findings as to how often the

Plaintiff "experienced seizures, whether the seizures came with alteration of

awareness or loss of consciousness and transient postictal manifestations of

unconventional behavior, and whether there was significant interference with

[Plaintiff's] activities during the day."  (Doc. 7, p. 11); (Doc. 15, p. 3).

While Plaintiff does not specifically challenge the ALJ's ruling on the grounds that it fails the standard set forth in Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112 (3d Cir. 2000), her argument follows from the principles set forth in that decision.  (Doc. 7, pp. 7-11); (Doc. 15, pp. 3-4).  In Burnett, the United States Court of Appeals for the Third Circuit held that an administrate law judge is required to set forth the reasons for his/her decision, and that a bare conclusory statement that an impairment did not match, or is not equivalent to, a listed impairment is insufficient.  Burnett, 220 F.3d at 119-20; see Jones v. Barnhart, 364 F.3d 501, 504 (3d Cir. 2004).

"For a claimant to show his impairment matches a listing, it must meet all of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  Jones, 364 F.3d at 504 (citation omitted) (emphasis in original).

### a)  ALJ's Decision Regarding Listing 11.02

To meet the criteria in Listing 11.02, in addition to showing convulsive epilepsy that is documented by a detailed description of a typical seizure pattern, including all associated phenomena, occurring more frequently than once a month, in spite of at least 3 months of prescribed treatment, the plaintiff must provide sufficient medical evidence that she meets the criteria listed for daytime or

nocturnal episodes.  20 C.F.R. Part 404, Subpart P, Appendix 1, 11.02.

Here, the ALJ determined that Plaintiff did not meet all the criteria under Listing 11.02.  (Tr. 31-32).  However, as stated above, Plaintiff argues that the ALJ did not fully and completely analyze Listing 11.02 in reaching her decision. This Court agrees.  The ALJ's decision ran afoul of the framework set forth in Burnett by not addressing the criteria in Listing 11.02(A).  Specifically, the ALJ erred by not addressing Plaintiff's daytime episodes, specifically whether she has experienced daytime episodes that have resulted in loss of consciousness.  (Tr. 25-38).

However, such an error does not warrant remand.  In Rivera v. Commissioner of Social Security, the United States Court of Appeals for the Third Circuit agreed with the plaintiff's argument that the administrative law judge's step three discussion was merely a conclusory statement that did not adequately describe the reasons for his holding.  164 F. App'x 260, 263 (3d Cir. 2006). However, the court in Rivera stated that "in reviewing the voluminous medical evidence available to us, we found abundant evidence supporting the position taken by the ALJ, and comparatively little contradictory evidence."  Id.  As a result, the court held that the administrative law judge's step three error was harmless, and refused to remand the matter on those grounds.  Id. at 263, 265.

44

Like Rivera, the ALJ's error here was harmless due to the abundant

evidence supporting her position that Plaintiff did not meet all of the criteria in

Listing 11.02(A).  As stated above, Plaintiff must show that her daytime episodes

resulted in loss of consciousness to satisfy the criteria under Listing 11.02(A).

Nowhere in the medical records before the Court does it show that Plaintiff lost

consciousness during a daytime episode.  Rather, Plaintiff specifically testified at

her hearing that she did not lose consciousness during her seizures.  (Tr. 61-62).

Additionally, Plaintiff stated to her physicians that she had not experienced loss of

consciousness or awareness during her seizures.  (Tr. 360, 363, 370, 385, 386,

389, 396).  Specifically, Plaintiff informed doctors at HHC on May 5, 2010, that

she had "events" and that they did not cause "loss of consciousness."  (Tr. 396).

Furthermore, during a November 24, 2009, visit at HHC, Plaintiff reported that

she had "never experienced an event that caused alteration or loss of

consciousness."  (Tr. 385, 386).  During a November 12, 2009, visit at HHC Dr.

Karceski stated that Plaintiff "has never experienced an event that caused

alteration or loss of consciousness."  (Tr. 389).  Dr. Mendiratta noted in October

2009 that Plaintiff's events were not associated with alteration or loss of

awareness.  (Tr. 360, 363).  On August 4, 2009,  Dr. Mendiratta noted that

"[a]lthough she had not had seizures associated with loss of awareness, she found

45

the simple partial seizures to be quite debilitating." (Tr. 370). It is also noted in Plaintiff's Adult Epilepsy Monitoring Unit Report, which details the results of her EEG Monitoring Video Record, that she had "never had loss of awareness during these spells." (Tr. 363).

Although the ALJ erred by failing to discuss why the specific evidence provided by Plaintiff did not meet the criteria found in Listing 11.02(A), due to the "abundant evidence supporting the position taken by the ALJ, and comparatively little contradictory evidence," such an error does not warrant a remand because it was harmless. Rivera, 164 F. App'x at 263.

In regards to Plaintiff's challenge to the ALJ's analysis of Listing 11.02(B), this Court finds that challenge is without merit. In Jones v. Barnhart, the United States Court of Appeals for the Third Circuit stated that "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." 364 F.3d 501, 505 (3d Cir. 2004). Rather, Burnett ensures "that there is sufficient development of the record and explanation of findings to permit meaningful review." Id. In Jones, the Third Circuit held that a court may read an ALJ's decision as a whole to determine whether Burnett has been satisfied. Id.

As noted above, Listing 11.02(B) requires that Plaintiff experience nocturnal episodes with "manifesting residuals which interfere significantly with

activity during the day."  20 C.F.R. Part 404, Subpart P, Appendix 1, 11.02(B).

Reading the ALJ's decision, there is substantial evidence in the record to support

the determination that Plaintiff had not experienced nocturnal episodes

manifesting residuals which interfered significantly with her activity during the

day.  (Tr. 33-34).

      The ALJ stated in her decision that although the "objective diagnostic tests

and clinical findings support[ed] some limitations as set forth in the [RFC], they

[did] not support greater limitations."  (Tr. 33).  The ALJ pointed to Plaintiff's

daily activities in support of her finding that greater limitations have not been

established.  (Tr. 33).  Specifically, the ALJ noted that the Plaintiff "report[ed] no

difficulties with personal care, and [was] able to cook and clean."  (Tr. 33).

Further, the ALJ stated that the Plaintiff testified that she was able to pick up

twenty (20) pound grocery bags, go up and down stairs in her home, and do

household chores, albeit with some assistance.  (Tr. 33).  The ALJ also found it

noteworthy that Plaintiff had a valid driver's license and "indicated to her

treatment providers that she [was] able to drive as she [was] able to anticipate a

seizure episode when she experiences numbness in her right toe."  (Tr. 33).

      Another factor the ALJ took in consideration in reaching her decision  is

that "there [were] no restrictions set forth by a treating physician."  (Tr. 34).

While pointing to this factor in support of her determination as to the Plaintiff's credibility, this fact can also support her decision that Plaintiff's nocturnal episodes have not significantly interfere with her activities during the day, as required criteria in Listing 11.02(B).  (Tr. 34).

Thus, this Court finds substantial evidence in support of the ALJ's finding that Plaintiff did not meet or medically equal all of the criteria in Listing 11.02(B).  As a result, Plaintiff's appeal on this ground will be denied.

### b)    ALJ's Determination as to Listing 11.03

To meet or equal Listing 11.03, a plaintiff's nonconvulsive epilepsy (petit mal, psychomotor, or focal) must be documented by a detailed description of a typical seizure pattern including all associated phenomena, occurring more frequently than once weekly in spite of at least three (3) months of prescribed treatment.  These episodes must also result in alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.  20 C.F.R. Part 404, Subpart P, Appendix 1, 11.03.

Reading the ALJ's decision as a whole, it is determined that there is substantial evidence in the record to supported the ALJ's determination that Plaintiff did not meet or equal all of the required criteria in Listing 11.03 because

48

the ALJ analyzed evidence that supports her finding that Plaintiff's episodes did not cause transient postictal manifestations of unconventional behavior or significant interference with activity during the day.  20 C.F.R. Part 404, Subpart P, Appendix 1, 11.03.

Specifically, the ALJ identified the Plaintiff's EEG evaluation in August 2009 as evidentiary support for her finding that Plaintiff did not meet all of the criteria in Listing 11.03.  (Tr. 32).  It was noted that the EEG evaluation failed to detect epileptiform activity, and that her episodes were non-epileptic in nature. (Tr. 32).  The ALJ stated that although the "objective diagnostic tests and clinical findings support some limitations as set forth in the [RFC], they [did] not support greater limitations."  (Tr. 33).  Furthermore, as discussed above, the ALJ noted that the Plaintiff "report[ed] no difficulties with personal care, and [was] able to cook and clean," and that she was able to pick up twenty (20) pound grocery bags, go up and down stairs in her home, and do household chores with some assistance. (Tr. 33).  The ALJ found it noteworthy that Plaintiff had a valid driver's license and "indicated to her treatment providers that she [was] able to drive as she [was] able to anticipate a seizure episode when she experience[d] numbness in her right toe."  (Tr. 33).  The ALJ also noted that "there [were] no restrictions set forth by a treating physician."  (Tr. 34).  These facts support the ALJ's decision that

Plaintiff's episodes did not result in transient postictal manifestations of unconventional behavior or significant interference with activity during the day as required in Listing 11.03. <u>Fargnoli</u>, 247 F.3d at 38 ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."). Therefore, the ALJ's determination that Plaintiff did not meet or equal all of the criteria in Listing 11.03 is supported by substantial evidence.

In regards to Plaintiff's argument that the ALJ erred by failing to fully and completely analyze Listing 11.03 in reaching her decision that Plaintiff did not meet all of the required criteria, specifically whether Plaintiff's episodes resulted in alteration of awareness or loss of consciousness, this Court follows the aforementioned analysis regarding Listing 11.02(A). Plaintiff testified before the ALJ and made statements to her treating physicians that she did not lose consciousness or awareness during her seizures. (Tr. 360, 363, 370, 385, 386, 389, 396). Due to the abundant evidence in the record supporting the position taken by the ALJ, such error was harmless, and is not grounds to vacate the ALJ's decision. <u>Rivera</u>, 164 F. App'x at 263.

### 2.    <u>ALJ's Consideration of Plaintiff's Work Record</u>

Plaintiff argues that the ALJ, in determining her credibility, focused almost

exclusively on her collection of unemployment benefits after the alleged onset date and completely ignored her work history.  (Doc. 7, p. 12).  According to Plaintiff, the mere fact that the ALJ failed to even mention Plaintiff's work history warrants a remand.  (Id.).

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility."  Frazier v. Apfel, 200 U.S. Dist. LEXIS 3105 (E.D. Pa. 2000) (citing Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir. 1997)); see also Casias v. Sec. of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991) ("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility."). The Social Security Regulations provide a framework under which a claimant's subjective complaints are to be considered.  20 C.F.R. § 404.1529.  First, symptoms, such as pain, shortness of breath, fatigue, etcetera, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings.  20 C.F.R. § 404.1529(b).  Once a medically determinable impairment that results in such symptoms is found to exist, the Commissioner must evaluate the intensity and

persistence of such symptoms to determine their impact on the claimant's ability to

work.  20 C.F.R. § 404.1529(b).  In so doing, the medical evidence of record is

considered along with the claimant's statements.  Id.  Social Security Ruling 96-7p

gives the following instructions in evaluating the credibility of the claimant's

statements:

> In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements.  In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true.  When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.

SSR 96-7p.

First, "[i]t is entirely proper for the ALJ to consider a claimant's receipt of

unemployment compensation benefits as inconsistent with a claim of disability

during the same period."  See Meyers v. Barnhart, 57 F. App'x 990, 991 (3d Cir.

2003).  Second, the ALJ discussed all evidence relating to Plaintiff's medically

determinable impairments and the symptoms Plaintiff alleged these impairments

caused.  (Tr. 33-34).

Ultimately, based on review of Plaintiff's subjective complaints and the

medical evidence of record, the ALJ concluded that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were "not credible to the extent they are inconsistent with the above [RFC]."  (Tr. 33). In arriving at this credibility determination, the ALJ pointed to the following in support: although Plaintiff has alleged disabling symptoms since her January 2008 surgery, she continued to work until July 2009 "when she was laid off for reasons unrelated to her alleged disabling impairments;" Plaintiff collected unemployment benefits after she was laid off "for which she attested that she [was] able to work;" and there were no restrictions set forth by Plaintiff's treating physician.  (Tr. 33-34).

By evaluating the extent to which Plaintiff's subjective complaints were reasonably consistent with the objective medical evidence, the credibility analysis was proper.  See Blue Ridge Erectors v. Occupational Safety & Health Review Comm'n, 261 F. App'x 408, 410 (3d Cir. 2008) (quoting St. George Warehouse, Inc. v. NLRB, 420 F.3d 294, 298 (3d Cir. 2005) ("[T]he ALJ's credibility determinations should not be reversed unless inherently incredible or patently unreasonable.")).  While Plaintiff argues that the ALJ erred in her credibility analysis because she failed to mention Plaintiff's extensive work record, it is well-established that the ALJ need not address every piece of evidence in the record.

Hur v. Barnhart, 94 F. App'x 130, 133 (3d Cir. 2004); see Johnson v. Comm'r of

Soc. Sec., 529 F.3d 198, 204 (3d Cir. 2004) (An ALJ may not reject pertinent

evidence without explanation, but does not need to cite all evidence the claimant

presents).  Therefore, while Plaintiff's work history was one (1) factor out of many

in determining her credibility, the ALJ was under no duty to discuss this work

history in her decision.  As such, the ALJ's credibility analysis is supported by

substantial evidence and will not be disturbed on appeal.

###    3.    ALJ's Evaluation of Plaintiff's Residual Functional Work Capacity

Plaintiff also argues that the ALJ determined that she has the RFC to

perform of sedentary, unskilled work without a medical opinion to limit her RFC.

(Doc. 7, pp. 15-16).  Plaintiff contends that an ALJ "cannot speculate as to

Claimant's RFC[,] but must have medical evidence and generally a medical

opinion regarding functional capabilities to support the determination."  (Id. at p.

14).

The ALJ stated the following in her decision:

> While these objective tests and clinical findings support some
> limitations as set forth in the residual functional capacity, they
> do not support greater limitations.  Likewise, [Plaintiff's]
> activities of daily living do not support greater limitations.

(Tr. 33).  Plaintiff testified that she could take care of her personal needs including

bathing, grooming, and dressing; go up and down stairs; pick up twenty (20)

pounds; stand for forty-five (45) minutes before she has to sit down; sit without

limitation; walk for thirty (30) minutes before needing rest; and drive if necessary.

(Tr. 48-52, 56-57).  The ALJ continued by noting that:

> there [were] no restrictions set forth by a treating physician.
> Given [Plaintiff's] allegations of totally disabling symptoms,
> one might expect to see some indication in the treatment
> records of restrictions placed on [Plaintiff] by a treating doctor.
> Yet a review of the record in this case reveal[ed] no such
> evidence.

(Tr. 34).

In the case at hand, the only opinion included in the record as to Plaintiff's

functional limitations is found in the [RFC] Assessment Form dated October 18,

2010, which was prepared by Ms. Masker.  (Tr. 424-429).  Ms. Masker also is

identified as the "Disability Examiner-DDS" on the "Disability Determination and

Transmittal" form, which also is dated October 18, 2010.  (Tr. 93-94).  There is no

indication in the record that Ms. Masker is a medical professional.[8]  (Tr. 93-94).

---

7.  In Santiago v. Astrue, 2012 U.S. Dist. LEXIS 44328 (E.D. Pa. 2012), Heather
Masker presented opinion evidence regarding the plaintiff's physical limitations.
The court in Santiago noted that Heather Masker's credentials were
"undetermined."  Id. at *15.  The court went on to state that "[t]he only indication
of Masker's credentials is the following letter/number code listed after her name:
'LEX K038.' [citation omitted] There is no evidence in the record that explains
this code."  Id.  Like Santiago, the only indication of Ms. Masker's credentials
here is the letter/number code listed after her name, LEX K38, the relevance, if

In fact, both the Disability Determination and Transmittal form and Physical RFC Assessment were signed only by Ms. Masker, and were not signed by a medical professional. (Tr. 93, 94, 428).

"This court has repeatedly found such statements from non-medical disability adjudicators insufficient evidence of a [plaintiff's] [RFC]." Smith v. Colvin, 2013 U.S. Dist. LEXIS 65400, *21-22 (M.D. Pa. 2013) (Caputo, J.) (citations omitted). "With respect to the reliance on a form completed by the state agency disability adjudicator, administrative law judges have been instructed to accord such documents no evidentiary weight." Id. at *22.  Furthermore, the ALJ has no duty to order a consultative examination or medical expert testimony in order to obtain a medical opinion as to Plaintiff's functional limitations. Rutherford v. Barnhart, 399 F.3d 546, 551 (3d Cir. 2005).  The SSA regulations state that if a plaintiff's "medical sources cannot or will not give us sufficient medical evidence about your impairment for use to determine whether you are disabled or blind, we may ask you to have one or more physical or mental examinations or tests." 20 C.F.R. § 404.1517; see also 20 C.F.R. § 404.1519(a).

However, the burden remains solely on Plaintiff to establish functional limitations.  Poulos, 474 F.3d at 92 (citing Ramirez, 372 F.3d at 550).  The ALJ

---

any, of which is not explained in the record.  (Tr. 94, 428, 429).

has no duty to further develop the record regarding the medical opinion evidence

because Plaintiff retains the burden of proving her disability.  20 C.F.R. §§

404.1512, 1513(d); see Rutherford, 399 F.3d at 551.  Therefore, based on the lack

of medical opinion evidence describing any functional limitations beyond those

identified by the ALJ, and based on Plaintiff's own testimony, it is determined that

there is substantial evidence to support the ALJ's RFC assessment.

### 4.  VE's Testimony

Initially, Plaintiff argues that two (2) of the three (3) employment options

suggested by the VE during his testimony are not consistent with the Dictionary of

Occupational Titles ("DOT") requirements.  (Doc. 7, p. 16-19).  During the

hearing before the ALJ, the VE testified that Plaintiff could perform three (3)

positions, assembler of small parts; receptionist; and video surveillance monitor.

(Tr. 64).  Specifically, the VE testified that the small part assembler, DOT number

706.684-022, consisted of sedentary work.  (Tr. 64).  However, according to the

DOT, that position of a small parts assembler consists of light work.  D.O.T.

706.684-022.  The VE also testified that a receptionist, DOT number 237.367-038,

had a specific vocational preparation ("SVP") rating of two (2).  (Tr. 64).  But,

according to the DOT, its SVP rating is four (4).  D.O.T. 237.367-038.  Plaintiff

contends that the lack of concise substantial testimony provided by the VE, and

the fact that these positions as described by the VE were inconsistent with the DOT, precludes a finding of "substantial evidence" to support the conclusion that Plaintiff was not disabled.  (Doc. 7, p. 18).

Defendant admits that the VE failed to mention the inconsistency of his testimony regarding the two (2) aforementioned jobs and the descriptions of these jobs included in the DOT.  (Doc. 14, p. 26-27).  Defendant argues that this was a harmless error "in this case particularly as the apparent inconsistency did not apply to the representative job of video monitor."  (Id. at p. 27).

"To determine what type of work (if any) a particular claimant is capable of performing, the Commissioner uses a variety of sources of information, including the DOT, the SSA's own regulatory policies and definitions (found in the Code of Federal Regulations ('CFR')), and testimony from vocational experts."  Zirnsak v. Colvin, 588 F. App'x 146, 154 (3d Cir. 2014).  "The DOT is a vocational dictionary that lists and defines all jobs available in the national economy and specifies what qualifications are needed to perform each job."  Id. at 155 (citation omitted).

As stated, the Commissioner can rely on the testimony from a vocational expert to meet its step-five evidentiary burden.  20 C.F.R. § 404.1566(e). Vocational experts "are most commonly used to provide evidence at hearings

before ALJs to resolve complex vocational issues." <u>Zirnsak</u>, 588 F. App'x at 155.

The United States Court of Appeals for the Third Circuit has stated that a common

issue arises when a vocational expert's "testimony conflicts with other sources of

information relied on by the Commissioner, namely the DOT." <u>Id.</u>  The

administrative law judge has to flesh out any inconsistencies in the record.  Social

Security Regulation 00-4p states:

> Occupational evidence provided by a [vocational expert]
> generally should be consistent with the occupational
> information supplied by the DOT. When there is an apparent
> unresolved conflict between [vocational expert] evidence and
> the DOT, the adjudicator must elicit a reasonable explanation
> for the conflict before relying on the [vocational expert]
> evidence to support a determination or decision about whether
> the claimant is disabled.  At the hearings level, as part of the
> adjudicator's duty to fully develop the record, the adjudicator
> will inquire, on the record, as to whether or not there is such
> consistency.

SSR 00-4p, *4-5.  "Specifically, an ALJ is required to: (1) ask, on the record,

whether the [vocational expert's] testimony is consistent with the DOT; (2) 'elicit

a reasonable explanation' where an inconsistency does appear; and (3) explain in

its decision 'how the conflict was resolved.'" <u>Zirnsak</u>, 588 F. App'x at 155

(quoting <u>Burns v. Barnhart</u>, 312 F.3d 113, 127 (3d Cir. 2002)).

The United States Court of Appeals for the Third Circuit has stated that:

> we continue to hold that inconsistencies between vocational

> expert testimony and DOT information may run afoul of that
> more general requirement–and may warrant reversal as a
> result–even when they do not come within the literal obligation
> imposed by SSR 00-4p.

Rutherford, 399 F.3d at 557.  "However, this Court has emphasized that the

presence of inconsistencies does not mandate remand, so long as 'substantial

evidence exists in other portions of the record that can form an appropriate basis to

support the result.'" Zirnsak, 588 F. App'x at 156 (quoting Rutherford, 399 F.3d at

557).

In Rutherford v. Barnhart, the plaintiff claimed that the ALJ's step five

determination was flawed.  399 F.3d at 556.  Specifically, the plaintiff argued that

the ALJ should not have been able to rely on the testimony provided by the

vocational expert because his testimony was inconsistent in several respects with

the information contained in the DOT and "because the ALJ did not inquire about

those inconsistencies or explain why he chose to follow the testimony rather than

the DOT." Id.  The court found that the vocational expert explicitly stated that

"other occupations would be available and that he was simply providing

examples," and inconsistencies were not present as to each of the jobs listed by the

vocational expert.  Id. at 557.  In relation to the "two jobs identified by the

[vocational] expert with [SVP] classifications that render them beyond the ALJ's

limitation to unskilled work," the court held that these inconsistencies "are simply

not egregious enough–either in number or in substance–to bring into question the

ALJ's reliance on the expert testimony as a whole." <u>Rutherford</u>, 399 F.3d at 558.

"Therefore, although some minor inconsistencies may exist between the

vocational testimony and DOT information, we conclude that the testimony

provided substantial evidence for the ALJ's conclusions." <u>Id.</u>

Similar to <u>Rutherford</u>, the VE in the case at hand testified to "alternate

options" of employment that would "include" small parts assembler, video

monitor, and receptionist. (Tr. 64). Here, the VE was referring to a non-

exhaustive list of employment options that provided a representative example of

the type of employment options available to Plaintiff. (Tr. 64). Further, like

<u>Rutherford</u>, the VE in the instant case identified two (2) jobs with SVP

classifications beyond the scope of unskilled work. (Tr. 64). However, in

accordance with <u>Rutherford</u>, these two (2) inconsistencies are not egregious

enough to bring into question the ALJ's reliance on the VE's testimony as a whole

because the ALJ correctly identified a third job of video monitor that was

consistent with the DOT.

Furthermore, with respect to Plaintiff's argument that the video monitor is

beyond the unskilled RFC limit as set by the ALJ, it is determined that this

assertion is unfounded. Plaintiff argues that the video monitor position is a level 3 (R3) reasoning position according to the DOT. (Doc. 7, p. 18). However, "[t]o determine the level of skill required by a particular occupation [] the ALJ is not required to make an assessment of the DOT reasoning levels." Hiester v. Colvin, 2014 U.S. Dist. LEXIS 2106, * 33 (M.D. Pa. 2014) (Munley, J.). "Rather, the ALJ is permitted to rely on the Commissioner's regulatory definition of unskilled work set forth in SSR-00-4p, 2000 SSR LEXIS 8 to determine the level of skill, judgment and [SVP] time required by the occupations identified by the vocational expert." Id. (citing 20 C.F.R. § 404.1568(a)); SSR 00-4p, 2000 SSR LEXIS 8 at *8 (stating that the Commissioner's "regulatory definitions of skill levels are controlling."). "Thus, it would be inconsistent with the Commissioner's regulatory scheme to rely upon the 'reasoning levels' in the DOT as evidence that the mental demands of the jobs identified by the vocational expert exceed those for unskilled work." Id. at *34 (citing 20 C.F.R. §§ 404.1568(a), 416.968(a)).

In the case at hand, a video monitor position is listed at an SVP-2 level. See D.O.T. 379.367-010. An SVP-2 level falls into the unskilled work category as defined in 20 C.F.R. §§ 404.1568, 416.968; see Hiester, 2014 U.S. Dist. LEXIS 21606, at *34. As such, there is substantial evidence to support the VE's testimony, and the ALJ's subsequent decision that Plaintiff could perform the

unskilled, sedentary work of a video monitor.

## **CONCLUSION**

The Court's review of the administrative record reveals that the decision of

the Commissioner is supported by substantial evidence.  Therefore, pursuant to 42

U.S.C. § 405(g), Plaintiff's appeal will be denied.

A separate Order will be issued.

**Date**: March 16, 2015

/s/ Williams J. Nealon_____

**United States District Judge**
